E. TAYLOR, ET AL. *v.* J. C. MINOR, ET AL.

[Abstract Kentucky Law Reporter, Vol. 7—104.]

**Mental Capacity to Make Valid Will—Monomania.**

An insane delusion on one subject may exist in the mind of a person, without affecting his ability to properly attend to all his social and business duties. He may be insane on one subject or set of subjects and entirely rational as to all other matters.

**Conflicting Evidence as to Mental Capacity.**

Where an issue is formed as to mental capacity to make a will and the evidence is conflicting and no error of law was made at the trial this court will not reverse the lower court.

**Burden of Proof in Contest of Will.**

The burden of proof is on the propounders of a will, but when due execution of the will, consistent upon its face and apparently rational in its provisions, has been proven and the will is assailed upon the ground of mental incapacity in the maker, the burden shifts to the contestants.

APPEAL FROM MARION CIRCUIT COURT.

May 7, 1885.

OPINION BY JUDGE HOLT:

The will of Bannister Taylor, made when he was about forty-six years old, excluded his daughter, Martha, and her husband, J. C. Minor, from all participation in his estate, which amounted to about twenty thousand dollars.

It says: "My daughter, Martha, without my knowledge, has eloped and as I am informed has become the wife of an unprincipled scoundrel by the name of James Minor, and as a mark of my disapprobation of her disobedience and disrespect to her parents and because I do not intend that Minor shall directly or indirectly enjoy any part of my estate, therefore my will is and I so order and direct that neither my said daughter, Martha, and the said James Minor shall ever receive or enjoy any part or portion of my estate of any kind whatever."

In another clause it provides that "if any of my children now single should marry without the consent of my wife, my will is that such child shall have no part of my estate, but their share is to be

divided among the rest, who are more obedient;" and among other matters again says: "But in no event whatever is Martha to have any part of my estate."

The will was dated on September 17, 1844. Martha eloped, and was married sixteen days before, being then seventeen years old and the eldest child. The testator did not die until September 11, 1876, and shortly after his death the paper in question was found among the title papers to his property.

Its due execution was sufficiently shown in the lower court, but it was rejected as the last will and testament, being assailed upon the ground that its maker had an ungovernable prejudice against or insane aversion to his daughter Martha and her husband, and was a monomaniac as to his relations toward and obligations to them; and that the paper in question is the result of this insane delusion.

It is evident from a perusal of it that at the time of its execution, the elopement and marriage of his daughter were uppermost in his mind and that he was greatly incensed at her and her husband. It is urged upon the one hand that the preservation of the paper by him for over thirty years shows a fixed purpose upon his part to exclude the daughter and her husband from all share in his estate; and that if he had have been the victim of an insane delusion at the time of its execution, he would during the long lapse of time until his death, have either recovered from it, or become worse.

It is insisted upon the other side that the insane delusion having taken possession of him, and overturned his mind upon the one subject, that his reason as to it never returned to him; and reliable expert testimony in the record shows that this may occur without a marked change or even any, in the person; that he may be able to attend properly to all his social and business duties, and yet be insane upon one subject or set of subjects while he is entirely rational as to all other matters; that this may exist for years without any perceptible change, and that the subject may, to a very great extent, keep it secret.

It appears in this instance that the maker of the paper was an unusually firm man; above the average in intelligence; slow in forming, but firm in his opinions; that he always managed his business well; was at one time a justice of the peace; acted twice

or more as a personal representative; an elder in his church and believed in forgiveness in order to be forgiven; kind in his family, but required his will to be the undisputed law to them, and was a citizen above reproach.

Upon the other hand it appears that J. C. Minor at the time of the marriage was of excellent character; that he had been received as a guest by the hospitable father of Martha beneath the paternal roof and that no long after the marriage, he became a Methodist preacher and has always been a most exemplary man in all the relations of life; that shortly after the marriage Martha went to her father's and he roughly drove her away without allowing her to enter the house, telling her to stay with the scoundrel she had married and to never return; that afterwards when she lay at death's door he said he would not care to hear of her death at any time; that again when she with her promising son went to his house to attend the burial of her sister, he would not speak to or eat with either of them or even remain in the same room; that he would not allow anyone to talk to him as to Martha; rejected all overtures at a reconciliation; became greatly excited when talked to about her; one witness says that when he named the subject to him "his looks were unnatural;" another says that when it was mentioned he would get "off his balance." He made it a condition for friendship with his brother and others, that they should not receive his daughter into their households and repulsed his pastor and others with much feeling when they approached him as to her.

A careful examination of the record has shown us that the evidence upon the question of monomania is quite conflicting, and it is not our place to usurp the province of the jury, if no error of law was committed upon the trial.

The testimony as to J. C. Minor's general character was competent as tending to show that one of the reasons given by the father for excluding his daughter from participation in his estate was untrue and without any reasonable foundation and could only have been conceived by a disordered mind. The evidence relating to the alleged misconduct of the father and sister of J. C. Minor was not rendered competent, even admitting that it could have been made so by any avowal that the maker of the paper in contest knew or had ever heard of it.

One witness testified that he often saw and talked with the father;

that he heard a good deal as to his conduct and feeling toward Mrs. Minor, and that he formed an opinion that he was not rational in this respect; and he supposed that this was based both upon what he saw and heard. The fact that the witness could not after the lapse of a long time recall specific transactions with the father or separate the rumor from what he himself saw of him, did not authorize the rejection of the witnesses' opinion as testimony.

A great many instructions were asked and several given. A review of them in detail is unnecessary, and we will notice only those which were given and which are specially objected to by the appellants.

By the first one the jury were told that "the burden of proof is on the propounders of the will in this case." If this were not qualified by another it could not be sustained because when the due execution of a paper consistent upon its face and apparently rational in its provisions has been proven as a will and it is assailed upon the ground of incapacity in the maker, then the burden shifts to the contestants, but in the fourth instruction that was given, the jury were instructed that they must believe from the preponderance of the evidence that Bannister Taylor was a monomaniac as to his daughter and her husband and their marriage when he made the will and that if it was "produced or affected" by such monomania they must find against it.

The jury could not well have misunderstood the meaning of the word, monomania, and we do not think it was necessary to explain it to them.

The general rule is that in order to invalidate the paper, offered as a will, upon the ground of monomania that it must have been produced by it, or be the direct result of it, but the word "affected" must be understood as having been used by the court as equivalent to telling the jury that the monomania must have produced a change; this is its ordinary meaning and they doubtless so understood it and were not thereby misled. The instructions given, when considered as a whole, presented the law of the case to the jury and their verdict must be held to end this unfortunate and protracted family litigation.

Judgment *affirmed.*

*W. B. Harrison, W. Lindsay, for appellants.*

*Hill & Rives, for appellees.*